# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AARON M. STONEROCK, | : | Case No. 3:18-cv-00296 |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| COMMSSIONER OF SOCIAL SECURTY ADMINISTRATION, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a disability, among other eligibility requirements. A disability in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Aaron M. Stonerock, applied for Disability Insurance Benefits in November 2014, asserting that as of July 29, 2014, he could no longer work due to prolonged post-traumatic stress disorder (PTSD) and depression. Plaintiff's application and evidence reached Administrative Law Judge (ALJ) Gregory G. Kenyon who conducted a hearing during which Plaintiff testified. Shortly thereafter, ALJ Kenyon concluded that Plaintiff

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act.

Plaintiff brings this case challenging ALJ Kenyon's decision. He seeks a remand to the Social Security Administration for payment of disability insurance benefits or, alternatively, for further proceedings. The Commissioner seeks an Order affirming ALJ Kenyon's non-disability decision.

## II. Background

### A. Plaintiff

Plaintiff was a "younger" person (thirty-seven years old) on his asserted disability onset date. 20 C.F.R. §404.1563(c). Before he applied for benefits, he worked as a hardware salesperson and a shipping clerk.

During his administrative hearing, Plaintiff testified that he completed the eleventh grade in high school. (Doc. #5, *PageID* #128). He did not graduate from high school due to anxiety and agoraphobia. He stated, "I was afraid of being around people, essentially." *Id*.

Plaintiff testified that, his health problems included panic attacks three to five times per week involving shortness of breath, rapid heartbeats, crying fits, and flashbacks to traumatic events. *Id.* at 130. He described his panic attacks as "a fight or flight situation and I shut down or remove myself from whatever activity I was trying to do." *Id*. His panic attacks can be brought on by flashbacks to traumatic events he endured between ages ten and twelve. Many years later (in 2012), his wife was diagnosed with cancer and this "kind

2

of sent [him] spiraling back through that…," meaning his childhood trauma. *Id*. at 130-31.

He explained:

> When I was younger I suffered a lot of abuse from a stepfather, and it gave me a fear, mostly, of males. My father left when I was two years old and I was raised by my grandmother and my sister while my mother worked most of the time. So, I had a stepfather that would tell me that I was raised by women and that I wasn't a man and that would beat me and try to force me to do things, hunting and things like that, that I was unfamiliar with. And when I would disappoint him, it was very much a torture situation.

*Id*. at 141. Being around adult men is especially difficult. He said, "it still feels like I'm the 12-year-old kid that I was so the people that are my friends feel so much older than me, it's intimidating." *Id*. at 132-33.

Plaintiff also has a history of depression. His symptoms include has crying spells several times a week, usually at night, and he sometimes wakes up crying. *Id.* at 133. He sleeps only four hours at a time during the night. *Id*. at 144. He has difficulty concentrating. For example, after he watches a television program for thirty minutes, he needs to restart the program in order to absorb the information because he "will kind of wander off." *Id*. at 133.

Plaintiff told the ALJ that when he is home alone, he sometimes experiences paranoia. If a condominium maintenance person knocks on his door, he will sometimes lock himself in his room because he gets scared that he will have to let them in. *Id*. at 145. He has constant fear and nightmares about people trying to break into his home. This causes him to wake up "virtually paralyzed" and he tries to scream to himself to move until he is able to get out of bed. He noted, "I'm conscious but I'm stuck in bed, unable to

move." *Id*. at 145.

Plaintiff testified that he had problems with concentration at his past job. During the last year of his employment, he would forget to do things and was written up for it. *Id.* at 133-34.

He also has suicidal thoughts almost every night before going to sleep and upon waking up in the morning. He revealed, "I have a wife and family that are very loving, and it prevents me from acting out on any of them [his suicidal thoughts]." *Id*. at 134. Depression saps his energy level. He illustrated this, saying, "My energy level is extremely low, I've disengaged with … my friends, even simple things that I used to do like online video gaming, we would use like chat servers where you could talk to each other while you were playing the game and I no longer play those games with them anymore because I cannot interact with people that used to be my friends." *Id*. Social anxiety also prevents him from reported gathering with his friends or do things with his wife, like taking her out to dinner or concerts. *Id.* at 131. He very rarely leaves home. He goes to doctor appointments once per month. *Id.* Plaintiff testified that he has a lot of anxiety when he is in unfamiliar places. He has trouble focusing and cannot pay attention to conversations. *Id.* at 132.

**B.**     **Adelia Barone, M.S., M.A., LPCC**

Plaintiff first saw Ms. Barone for counseling in late July 2014. (Doc. #5, *PageID* #s 449-50). Ms. Barone described his presenting problem: "Client is at breaking point

4

emotionally. Cannot work. He sits and stares for hours, does not want to engage." *Id.* at 450. Plaintiff reported distress, anxious mood, tension, low energy, fatigue, poor concentration, short term memory problems, withdrawal, panic attacks, phobias, tearfulness, guilt/remorse, loss of interest, hopelessness, and anger/irritability. On mental status examination, Plaintiff exhibited a sad and depressed mood, slowed speech, restricted affect, and he was anxious. *Id.* Ms. Barone diagnosed PTSD and dysthymic disorder. *Id.*

Ms. Barone documented Plaintiff's reports and her clinical observations as distress, sadness/depression, anxiety/tension, guilt/remorse, fatigue/low energy, memory problems, poor concentration, negative self-beliefs, and loss of interest. *Id.* at 457. Over time, Ms. Barone documented either reports or observations to include many of the above as well as withdrawal, panic attacks, fidgety, phobias, tearfulness, a restricted affect, a labile affect, a flat affect, guilt/remorse, loss of interest, negative self-beliefs, hopelessness, anger/irritability, and indecisiveness. *Id.* at 457-517, 578-722, 726-28.

In October 2014, Ms. Barone wrote a letter explaining that Plaintiff had been in individual therapy with her since July 31, 2014 for diagnoses of PTSD and dysthymic disorder. She noted that since his treatment began, he had developed agoraphobic behaviors and his anxiety continued and was getting worse. He tried a volunteer job but could not do it because of "panic attacks and physical health issues." *Id.* at 658. Plaintiff's mother stays with him during the day so his wife can work without worrying about whether he will hurt himself. He repeatedly told Ms. Barone that he would never kill himself. He continued to have bad dreams and flashbacks, and recently saw a psychiatrist to try medication changes.

5

Ms. Barone opined, "Mr. Stonerock currently is unable to work and needs extended time and assistance to regain some type of normality in his life." *Id*.

On May 28, 2015, Plaintiff presented with a flat affect, neutral motor calm; he exhibited distress, anxiety, guilt, and social withdraw. Ms. Barone described Plaintiff as "very emotional. Wants to be successful. Cannot function with stress of the work." *Id.* at 498.

On June 11, 2015, Plaintiff's affect was labile; mood was sad and depressed; he was tense; and speech was slow. He exhibited sadness, anxiety, anger, and guilt. He reported crying, appetite up and down, sleep problems, social withdrawal, fatigue, low energy, indecisiveness, hopelessness, and "very stressed. Looking to try to do some new job." *Id.* at 500. By June 18, 2015, he continued to have a labile affect and sad mood, he was still withdrawal socially and "cannot try even a volunteer job" and "feels much guilt about being sick when his wife went through cancer." *Id.* at 501.

On August 27, 2015, Plaintiff was very distracted over recent paperwork from the insurance company, feels hopeless, panic, crying, and sleep problems. *Id.* at 509.

On September 3, 2015, Ms. Barone noted Plaintiff's affect was flat and his mood was neutral. Plaintiff was anxious, had guilt, remorse, interested about money, more depressed, felt he was going to lose everything, reported nightmares, not sleeping well, afraid to say how bad he feels, and feels anxious over appointments. *Id.* at 511. When seen on September 10, 2015, Ms. Barone reported Plaintiff's affect was flat, mood was sad and

6

depressed, motor was lethargic. He reported he was distressed, sad, anxious, angry, suffering from panic attacks, having sleep problems, crying, and fatigue. Ms. Barone observed that Plaintiff was irritable and unable to sit down and focus due to stress. He has feeling no motivation to go outside. *Id.* at 513. On September 17, 2015, Plaintiff's mental status remained the same, he reported it was a stressful week and he "experienced depersonalization." *Id.* at 515.

On October 6, 2015, Ms. Barone prepared a narrative to Social Security in which she reported treating Plaintiff in individual therapy since July 31, 2014, with the diagnoses of PTSD and dysthymic depression. During his initial intake, he has experienced many frustrations and setbacks. He has developed agoraphobic behavior and continues to have anxiety. He has tried to take a job but cannot meet the requirements due to his panic attacks, anxiety, and physical health issues. Prior to this letter, Plaintiff reported to Ms. Barone that his mother comes during the day to stay with him, so his wife can work without worrying. He says on numerous sessions, he will never kill himself due to the pain it would cause to his wife and mother. His anxiety is getting worse. He continues to have bad dreams and flashbacks. He had recently gone to a psychiatrist for counseling and is working on medication. According to Ms. Barone, Plaintiff is currently unable to work and needs extended time and assistance to regain some type of normalcy in his life. *Id.* at 448.

In December 2016, Ms. Barone completed a Mental Impairment Questionnaire in which she indicated that Plaintiff had been treated with cognitive behavioral therapy and pharmacological treatment "with little progress." *Id.* at 724. He "presents as being unable

to overcome trauma and depression to be able to function in a normal job environment. He demonstrates anxiety, depression, loss of focus, sleep issues, low energy, crying, social withdrawal indecisiveness and stomach issues." *Id*. Ms. Barone opined that Plaintiff was markedly restricted in work-related mental functions that would cause him to be absent from work two or more times per month. *Id.* at 725.

**C.** **Richard Sexton, Ph.D.**

Dr. Sexton evaluated Plaintiff in June 2015 for the Ohio Division of Disability Determinations. *Id.* at 409-16. Plaintiff reported feeling depressed and admitted past suicidal thoughts and attempts. He also reported frequent feelings of guilt, hopelessness, helplessness, and worthlessness. During the end of his last job, Plaintiff had received some poor performance reviews but that no employer had ever recommended mental health care, counseling, or fitness-for-duty evaluations. *Id.* at 411.

Dr. Sexton observed that Plaintiff's "prevailing mood was depressed and anxious and his affect was flat." *Id.* at 412. Dr. Sexton assessed Plaintiff with a depressive disorder not otherwise specified and anxiety disorder not otherwise specified. *Id.* at 414. Dr. Sexton expected Plaintiff to have difficulty responding appropriately to workplace pressures. Plaintiff demonstrated slight difficulty maintaining concentration, attention and focus in performing simple and multi-step tasks during the evaluation. According to Dr. Sexton, although Plaintiff may experience a subjective sense of reduced effectiveness in attention and concentration when his "depressive and anxious symptoms increase, objective changes

8

in a level prompting [work] performance concerns by others are not to be expected." *Id.* at 416.

**D.    Psychologists Joseph Edwards, Ph.D. and Irma Johnston, Ph.D.**

Dr. Edwards reviewed the administrative record in July 2015 and described Plaintiff's impairments as anxiety disorder and affective disorder. *Id*. at 161.  He opined that Plaintiff has moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  *Id.*  He further opined that because of depression and anxiety, Plaintiff would have difficulty in maintaining attention and concentration needed to perform detailed, complex instructions.  He could carry out one-to-three step tasks in settings without prolonged periods of uninterrupted concentration.  *Id*. at 166.  Dr. Edwards recognized that Plaintiff tends to be withdrawn and would likely have moderate difficulties interacting with others.  He would do best, Dr. Edwards believed, in an environment requiring only superficial, infrequent contact with others.  *Id.*

Dr. Johnston reviewed the administrative record in October 2015, and reached the same conclusions as Dr. Edwards.  *Id.*at 179-85.

**E.    Steven Dyckman, M.D.**

Dr. Dyckman reviewed Plaintiff's medical records for an insurance company in December 2015.  *Id.* at 888-90.  Dr. Dyckman described Plaintiff's August 2015 through October 2015 records as indicating, "[d]epression, severe social anxiety, anger, fatigue, and road range.  Mood is depressed, affect is flat on mental status…, poor decision making, poor

problem solving…, poor insight, depressive, suicidal, and anxiety. Memory is intact. Poor concentration…. The claimant is unable to return to work full-time. The claimant is smart but due to depression and anxiety has problems functioning well." *Id*. at 888.

Dr. Dyckman concluded that Plaintiff "is mentally, cognitively, and behaviorally impaired. [Plaintiff] has severe PTSD and dysthymic depression. He is unable to work at this time in any capacity, therefore, no work activity restrictions are required at this time because the claimant is unable to work in any capacity at this time…." *Id.* at 890.

**III. Standard of Review and ALJ Kenyon's Decision**

Review of ALJ Kenyon's decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL 3549787, at *1 (S.D. Ohio 2018) (Rice, D.J.).

ALJ Kenyon reviewed the evidence and evaluated Plaintiff's disability status under each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. His more pertinent findings began at steps two and three where he found that Plaintiff had severe impairments—fibromyalgia, temporomandibular joint (TMJ)

dysfunction, an anxiety disorder, PTSD, and depression—and that his impairments did not automatically qualify him for benefits. (Doc. #5, *PageID* #s 57-60).

At step four, the ALJ concluded that the most Plaintiff could do (his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of medium work with many limitations. The ALJ found:

> The claimant … is limited to no work around hazards such as unprotected heights or dangerous machinery. The claimant is limited to performing unskilled, simple, repetitive tasks with no fast-paced production work or jobs that involve strict production quotas. The claimant is further limited to occasional contact with coworkers and supervisors, no public contact, no teamwork or tandem tasks, and jobs that involve very little, if any, change in the job duties or the work routine from one day to the next.

*Id.* at 60.

The ALJ concluded at step five that there were many full-time jobs Plaintiff could perform. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits.

## IV. Discussion

Plaintiff focuses on the ALJ's assessment of his mental-work limitations. He contends that the ALJ erred in weighing the opinions of his treating counselor, Ms. Barone; the peer-review opinion from Dr. Dyckman; and the assessments from the non-examining state agency psychologists, Drs. Edwards and Johnston.

### A. **Medical Source Opinions**

Social Security Regulations require ALJs to adhere to certain standards when

weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.*

## B. Ms. Barone and Dr. Dyckman

ALJ Kenyon reviewed Ms. Barone's opinions and assigned them little weight. He reasoned, in part, that Ms. Barone is not a psychologist or psychiatrist but, instead, has an MA and MS. (Doc. #5, *PageID* #66). The ALJ, however, overlooked that Ms. Barone is also a Licensed Professional Clinical Counselor (LPCC). Although this does not mean that she is a licensed psychologist or psychiatrist, it does mean that the ALJ overlooked or did not realize that Ms. Barone possessed another meaningful qualification—endorsed by the State of Ohio—for mental-health counseling and diagnosis. *See* *https://cswmft.ohio.gov/Counselors/LPCC*. It was error for the ALJ discount Ms. Barone's opinions by overlooking or not understanding the significance of her status as a Licensed Professional Clinical Counselor in Ohio.

The ALJ provided three more reasons for discounting Ms. Barone's opinions: (1) they "seem based entirely on the claimant's subjective complaints"; (2) "The level of mental health treatment the claimant has received has been conservative and does not support the level of limitations alleged by Ms. Barone"; and (3) "Ms. Barone's opinion that the claimant is unable to work due to stress is an issue reserved for the Commissioner." (Doc. #5, *PageID* #66). None of these reasons supports the ALJ's rejection of Ms. Barone's opinions.

First, Ms. Barone's treatment notes reveal that she based her opinions on the many clinical signs she observed and on the results of her objective mental-status exams. *See supra*, §II(A); *see also PageID* #s 447-518, 578-723, 726-728, 805-822, 1156-1209. Psychiatrist Dr. Dyckman confirmed this view of Ms. Barone's observations and findings.

13

He wrote:

> Yes, the medical evidence submitted is adequate, and there were full formal mental status exams performed as part of the claimant's workup in each of the progress note[s]. Result of the exam[s] showed the claimant would have a flat or constricted affect and depressed mood with observed anxiety and tension, also would have crying and feelings of hopelessness. Thought process, had poor decision making, poor problem solving, occasionally will have suicidal thoughts.

(Doc. #5, *PageID* #889). And, "when mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (citation omitted); *see Warford v. Astrue*, No. CIV.A 09-52-GWU, 2010 WL 3190756, at *6 (E.D. Ky. Aug.11, 2010) ("interviews are clearly an acceptable diagnostic technique in the area of mental impairments and [an examining psychologist] could rely upon the subjective complaints elicited during the interview in formulating his functional restrictions"). Substantial evidence therefore fails to support the ALJ's finding that Ms. Barone rested her opinions "entirely on" Plaintiff's subjective complaints.

Second, the ALJ's rejection of Ms. Barone's opinions based on Plaintiff's "conservative" care is flawed. It is unclear what mental-health-care treatment the ALJ thought Plaintiff did not receive. As Dr. Johnston noted, the record shows that Plaintiff saw Ms. Barone for counseling on a weekly basis. *Id*. at 180. During the ALJ's August 2017 hearing, Plaintiff testified that he was then seeing her monthly because his insurance company dropped him from their plan, and he was unable to afford weekly treatment despite

14

his desire for more frequent treatment. *Id.* at 142-43. Ms. Barone indicated in December 2016 that Plaintiff had been treated with cognitive behavioral therapy and pharmacological treatment. *Id.* at 725. It is unclear what additional treatment the ALJ thinks Plaintiff should have received. The same goes for the ALJ's rejection of Dr. Dyckman's opinions as on the supposed conservative care Plaintiff was provided. As a result, the ALJ's rejection of Ms. Barone's and Dr. Dyckman's opinions because Plaintiff allegedly received only limited or conservative care is unsupported by substantial evidence.

In addition, the medical evidence contradicts the ALJ's finding that the treatment record fails to support Plaintiff's level of limitations as found by Ms. Barone. In fact, Ms. Barone's opinions are entirely consistent not only with her own extensive and substantial treatment notes, but also with the opinions of psychiatrist Dr. Dyckman and arguably Dr. Sexton, who opined that Plaintiff's was expected to have difficulty responding appropriately to workplace pressures. Ms. Barone's treatment notes dating back to the alleged disability onset date repeatedly and consistently document a myriad of clinical signs, symptoms, and objective observations on mental-status exams, including (but not limited to): distress, anxious mood, sad mood, depressed mood, tension, slowed speech, low energy, fatigue, lethargic, poor concentration, memory problems, withdrawal, panic attacks, fidgety, phobias, tearfulness, a restricted affect, a labile affect, a flat affect, guilt/remorse, loss of interest, negative self-beliefs, hopelessness, anger/irritability, and indecisiveness. *Id.* at 447-518, 578-723, 726-28, 805-22, 1156-1209. Dr. Dyckman confirmed that Ms. Barone's treatment notes establish that Plaintiff was mentally, cognitively, and behaviorally impaired

15

by severe PTSD and dysthymic depression and was unable to work in any capacity. *Id.* at 890.

Third, recall that Ms. Barone thought stress prevented Plaintiff from holding a job. The ALJ rejected this by finding it an "issue reserved for the Commissioner." *Id.* at 66. The ALJ also gave little weight to Dr. Dyckman's opinion that Plaintiff could not cope with a minimal level of work because this is an issue reserved to the Commissioner. *Id.* at 65. This is not a valid reason, although it is one ALJs frequently use (*i.e.*, misuse).

> The pertinent regulation says that "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(e)(1). That's not the same thing as saying that such a statement is improper and therefore to be ignored, as is further made clear when the regulation goes on to state that "the *final* responsibility for deciding" residual functional capacity (ability to work—and so whether the applicant is disabled) "is reserved to the Commissioner." § 404.1527(e)(2) (emphasis added). And "we will not give any *special* significance to the source of an opinion on issues reserved to the Commissioner." § 404.1527(e)(3) (emphasis added).

*Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012).

Furthermore, Ms. Barone did not merely opine that Plaintiff was unable to work due to stress, she also opined that Plaintiff would be unable to perform specific work-related functions, including performing repetitive work, dealing with people, working alone or in isolation, performing under stress, and following specific instructions. *See*, *e.g.*, *PageID* #s 582, 590, 594, 672. In another assessment, Ms. Barone opined that Plaintiff was markedly restricted in work-related mental functions that would cause him to be absent from work two or more times per month. *Id.* at 725. The vocational expert testified at the hearing that an

16

individual with these limitations would be unable to sustain competitive employment at any exertional level. *Id*. at 149-51.

For these reasons, Plaintiff's challenges to the ALJ's review of Ms. Barone's and Dr. Dyckman's opinions are well taken.

## V.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence

of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether he was under a benefits-qualifying disability, including, at a minimum, a reassessment of his residual functional capacity and a re-consideration of the evidence at steps three, four, and five of the sequential evaluation.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability decision on February 26, 2018 be vacated;

2. This matter be remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations and any Order adopting this Report and Recommendations; and

3. The case be terminated on the Court's docket.

September 10, 2019             *s/Sharon L. Ovington*
                                                        Sharon L. Ovington
                                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).